UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | CRIMINAL ACTION NO. 11-10331-RGS |
| REZWAN FERDAUS, a/k/a "Dave Winfield" "Jon Ramos", Defendant. | ) ) ) ) ) | |

**DECISION ON THE GOVERNMENT'S
MOTION FOR DETENTION**
November 28, 2011

**HILLMAN, M.J.**

Nature of the Offense and the Government's Motion

On September 28, 2011, a criminal complaint issued charging Rezwan Ferdaus with: attempting to destroy federal government buildings using an explosive, in violation of 18 U.S.C. § 844(f); attempting to destroy national-defense premises, in violation of 18 U.S.C. §2155; and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §2339B. Ferdaus had his initial appearance before this Court on September 28, 2011 and at that time, the Government moved to detain him on dangerousness grounds pursuant to 18 U.S.C. §3142(f)(1)(A)(defendant has been charged with crimes of violence and acts of terrorism). A detention hearing was scheduled for October 3, 2011.

On September 29, 2011, an Indictment was returned charging Ferdaus with: attempting to damage and destroy a federal building by means of an explosive, in violation of 18 U.S.C. §844(f)(Count One); attempting to damage and destroy national-defense premises, in violation of

18 U.S.C. §2155 (Count Two); receipt of explosive materials, in violation of 18 U.S.C. §844(d)(Count Three); receipt and possession of non-registered firearms, in violation of 26 U.S.C. §5861(d)(Count Four); attempting to provide material support to terrorists, in violation of 18 U.S.C. §2339A; and attempting to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B(Count Six).

On October 3, 2011, Ferdaus appeared before me and pled not guilty to the offenses charged in the Indictment. The matter of detention was continued until October 20, 2011 and then, at the request of the defendant, until November 4, 2011. The detention hearing was held on November 4, 2011 and November 14, 2011. Bradley Davis, Supervisory Special Agent with the Federal Bureau of Investigation ("FBI"), a member of the Joint Terrorism Task Force and supervisor of the Special Agent Bomb Technician Program and Evidence Response Team, was called by the Government, and John Woudenberg, Special Agent with the FBI was called by Ferdaus. The following were admitted as Exhibits: affidavit of Special Agent Gary S. Cacace (*Ex. 1*); video recording excerpt from January 7, 2011 meeting (*Ex. 2*); Indictment (*Ex. 3*); Ferdaus May 2011 Plan (*Ex. 4*); Ferdaus June 2011 Plan (*Ex. 5*); June 2010 e-mails (*Ex. 6*); October 2010 e-mails (*Ex. 7*); excerpt from cell phone tutorial video (*Ex. 8*); photograph of Ferdaus holding firearm (*Ex. 9*); photograph of Ferdaus aiming firearm (*Ex. 10*); photograph of Ferdaus examining remote control airplane (*Ex. 11*); and letter from Worcester Islamic Center (*Ex. 12*).

Findings of Fact

During this investigation, the FBI utilized: a cooperating witness ("CW") who met with Ferdaus in December 2010 and began engaging in consensually recorded conversation with him in January 2011; two FBI undercover employees (referred to hereafter as "UC-1" and "UC-2" and collectively as "UCs" ) who met with and engaged in consensually recorded conversations with Ferdaus beginning in March 2011; and physical surveillance. The FBI has also obtained Ferdaus's phone and e-mail records.

The CW[1] first met the CW on December 17, 2010 outside a mosque in Worcester, Massachusetts. The CW had been sent to the mosque by the FBI for the purpose of initiating a meeting with Ferdaus. While the CW was standing outside the mosque talking to another individual about his criminal past, which involved illegal firearms, Ferdaus overheard the conversation and approached them. Ferdaus discussed whether the CW could get him guns and bombs; Ferdaus was interested in a starting a movement. This meeting was not recorded; the CW was debriefed after the meeting.

On January 7, 2011[2], the CW and Ferdaus met at the mosque. During the meeting, Ferdaus told the CW that he was planning to attack the Pentagon using explosive filled drone airplanes to make the "big hit"-- "to disable their [the United States] military center". He also said that the technology is now available to make such drone airplanes utilizing GPS guidance

---

[1] The CW has a criminal past involving gang activity, firearms and drug activity. Furthermore, during the course of this investigation, on February 11, 2011, the CW shoplifted an item from Radio Shack (and initially lied to his handlers about the fact that he had stolen the item) and there is a reasonable likelihood that he was using heroin during some parts of the investigation. The Government reduced the CW's role in the investigation after the shoplifting incident and stopped utilizing him altogether in April 2011.

[2] Starting with the meeting on January 7, 2011, all face to face meetings between Ferdaus and the CW were recorded, with the exception of the meeting on February 4, 2011; the February 4, 2011 meeting was not recorded due to an equipment malfunction.

systems and that he has knowledge of GPS and electronics and the skills to make it happen. Ferdaus indicated that they (he and the CW) would have to recruit some "brothers" and that they (the brothers) would have to be prepared spiritually to die. He said at the time, he may have one other "brother" ready to assist. During this meeting, Ferdaus asked the CW how much it would cost to procure 10 AK-47 assault rifles and hand-held grenades and whether the CW could procure enough explosives for an "improvised device". Ferdaus said he did not have the money to obtain the items they needed; it would be necessary to raise the funds. Ferdaus also explained to the CW that he could easily make a "detonator" using a spark plug, mechanical switch and cell phone.

At a January 11, 2011, meeting with the CW, Ferdaus asked if the CW could obtain enough explosive material to take out a target that is about three football fields long. When the CW indicated that he would have to get back to him, Ferdaus told him to look into it, it was important. In response to a question from the CW as to why he wanted to blow-up the Pentagon, Ferdaus responded that "This is what we have to do. This is the righteous way ... [to] terrorize enemies of Allah".

At a January 20, 2011, meeting, Ferdaus told the CW that in addition to the Pentagon, he was considering attacking a subway station, the United States Capital Building ("Capital") and/or a military base in Colorado; he also wanted to "gun down some politicians". He also reiterated that the main thing he needed was some high powered explosives. Additionally, Ferdaus told the CW that he was considering building his own improvised explosive device ("IED") if he could not raise enough money to buy high powered explosives; he would use such

4

a device to attack a subway station. When the CW asked Ferdaus why he would want to do that, Ferdaus responded that it would create a huge scare.

On March 4, 2011, Ferdaus had the CW take him to a public library so he could research remote controlled airplanes; Ferdaus discovered that such planes could carry 38-42 pounds. Later that day, he told the CW it would be cheaper to make his own explosives. After leaving the library, the CW took Ferdaus to three stores where they purchased a spark plug, a relay, a nine volt battery and ammonia. Ferdaus also told the CW to get him the AK assault rifle so he could begin practicing and learn how to use it.

On March 9, 2011, the CW introduced Ferdaus to the UCs. The CW told Ferdaus that the UCs were "brothers" and that they were "down with the cause." During lunch, Ferdaus told the UCs about his plan to attack the Pentagon with a remote controlled airplane. At some point during their meetings, Ferdaus explained to the UCs that while viewing jihadi websites and videos, he had come to realize how evil America is and that "jihad"[3] is the only solution. Therefore, he decided to "terrorize" the United States by attacking Washington D.C.

On March 18 and 23, 2011, Ferdaus met with the CW and during these meetings, he explained in more detail how he intended to detonate the remote controlled airplane using a cell phone. At Ferdaus's direction, they drove to a Toys 'R' Us where Ferdaus bought a rocket and rocket motors so he could test his plan.

---

[3] "Jihad": "[i]n Islam, the central doctrine that calls on believers to combat the enemies of their religion ... In the 20th and 21st centuries the concept of jihad has sometimes been used as an ideological weapon in the effort to combat Western influences and secular governments and to establish an ideal Islamic society". www.merriam-webster.com/concise/jihad?show=0&t=1321460183.

5

The CW and UCs met with Ferdaus on March 28 and 29, 2011. Ferdaus discussed with the UCs and the CW the progress he had made on his plan to attack the Pentagon. He told them he had discovered an on-line web site that sold remote control planes that can fly 100 miles per hour and carry a payload of up to fifty pounds. Ferdaus told them he could fly the plane using a built-in GPS system and that he could fit ten grenades inside. During the March 29th meeting, the UCs asked Ferdaus about his willingness to carry out his plan; Ferdaus told the UCs, among other things, that he wanted to attack the Pentagon, that no one was forcing him to do it, and that he believed the plan was within his unique capability. Ferdaus also stated that he had discussed his plan with a friend from Dorchester before meeting the CW. His Dorchester friend wanted to attack a recruitment center, however, Ferdaus wanted to do something bigger. Ferdaus also stated that he wanted to go Afghanistan and assist "overseas brothers" by teaching them physics or making something with technology.

On April 6, 2011, Ferdaus met with CW and reiterated some of the same ideas he had previously been talking about. He also mentioned that in addition to attacking the Pentagon, he wanted to attack the Capital; he indicated he would fly a second remote controlled plane into the Capital dome. He advised the CW that he would have to take a trip to Washington D.C. to find a place from which to launch the planes.

On April 18 and 19, 2011, Ferdaus met with the UCs. Because the UCs had previously indicated that they might be able to get financial assistance from overseas brothers, Ferdaus apparently felt he had to show them he was making technological progress. He again described his plan using grenade filled model airplanes guided by a GPS system. The explosives would be on a timer and the planes would crash into their targets in accordance with GPS coordinates.

6

When asked by the UCs if he had done research on his target, he indicated that he would have to do additional reconnaissance. When the UCs questioned the feasability of the plan, Ferdaus said he knew where to get two of three components for his plan, that his plan was close to completion and that he just needed to secure financing. With funding provided by the UCs, Ferdaus purchased an airplane ticket to travel to Washington D.C. on May 13, 2011.

In a May 5, 2011 meeting with UC-1, Ferdaus stated that he thought the UCs were members of al Queda. He also told UC-1 that he had done research for his plans and prepared a report; he handed UC-1 a thumb drive which contained a narrative of his planned attack, including photographs of his targets (the Pentagon and the Capital) and launch sites. He also included photographs of the model airplane he hoped to use and pictures and specifications of explosives he planned to use. (*See Ex. 4*). Ferdaus also orally described his attack plan to UC-1 and stated that he had identified an excellent launch location. He further stated that he would require three launch vehicles ( he chose remote control airplanes which are miniature versions of the U.S. military phantom). He described the flight plans for the three model airplanes; one was to be flown into the Capital dome and the other two were to be flown into opposites sides of the Pentagon at about fourth floor level. Each plane was to be filled with 16 grenades. Ferdaus indicated that he would need help obtaining the explosives and asked UC-1 for 48 of the most powerful handheld grenades he could find. Finally, Ferdaus demonstrated a mobile phone detonation device that he had built. He told UC-1 how it worked and said he could instruct others as to how to put such devices together.

On May 13, 2011, Ferdaus flew to Washington D.C., returning to Boston on May 15, 2011. During his trip, FBI agents observed him conducting surveillance and taking pictures of the Pentagon, the Capital and Eastern Potomac Park (his launch site).

On June 9, 2011, Ferdaus met with the UCs. During the meeting, Ferdaus gave the UCs a second thumb drive which contained his expanded plan and included photographs of his targets and launch site taken during his May trip to Washington D.C. (*See Ex. 5*). Ferdaus told them that he had added a ground assault to his plan, which involved six people armed with automatic rifles who would shoot people as they fled from the building. Ferdaus also explained that he had decided that it might be better to use homemade explosives rather than grenades. The UCs and Ferdaus drove to a Framingham storage facility Ferdaus had selected to build and maintain the components for his plan. Ferdaus told the UCs that he had told the manager of the facility that he intended to use the storage locker for music (on June 17, 2011, at Ferdaus's request, the UCs provided him funds to rent the storage locker; Ferdaus rented the storage locker under a false name.) During the meeting, Ferdaus provided the UCs with another mobile phone detonation device. UC-2 told Ferdaus that they hoped to get more phones from him to assist overseas operations targeting United States troops. Ferdaus was enthusiastic about the idea. Also during this meeting, Ferdaus told the UCs that his idea to attack the United States had come to him long before he met the CW or UCs.

On June 15, 2011, Ferdaus called UC-1 and requested that UC-1 wire him money so he could start working on obtaining the components to carry out his plan. He provided UC-1 with the name, location and phone number of the money transmitter where he wanted the money sent.

At a June 27, 2011 meeting, Ferdaus provided each of the UCs with a mobile phone "detonation" device. The UCs then told Ferdaus that the other detonation devices he had provided had worked and had been used to kill three United States soldiers and injure three or four others (the story was false. ) Ferdaus was excited by the news and responded "we're changing the world." During the meeting he also indicated that he was okay with killing people, that it was what he wanted and he felt "blessed." He offered to provide more phone detonation devices. Additionally, the UCs and Ferdaus talked about whether grenades were the best explosive to use and he indicated that if obtainable, plastic explosives would be preferred. Ferdaus told the UCs he was relying on them to obtain the explosives and that he would also need two vans, six "automatics", a side arm with a silencer, and nine grenades.

On July 21, 2011, Ferdaus met with the UCs and told them he had researched purchasing three remote controlled aircrafts (two Sabre F-86's for the attack on the Pentagon and one F-4 Phantom for the attack on the Capital). He planned to purchase one of the Sabre aircraft first and have it delivered to the storage facility. UC-1 gave Ferdaus $4,000 to make the purchase. Ferdaus purchased the aircraft under a false name (Dave Windfield). Ferdaus also told the UCs that he wanted to maximize the explosive impact of his plan and therefore, requested that they get him 24 pounds of plastic explosive. He planned to use fifteen pounds of explosive in the airplanes and he would use the remaining nine pounds to blow up the bridges near the Pentagon.

In an August 1, 2011 meeting, Ferdaus told the UCs he wanted to increase his production of mobile phone detonation devices. He indicated that he could construct the devices or just send a shipment of phones along with instructions as to how to make them into detonation devices. He brought three more detonation devices to the meeting. Ferdaus said that he could

9

make cheaper devices using Tracfones which cost less than ten dollars and that he could make 20-30 per week at the storage facility. During the meeting he stated that he wanted to kill as many non-believers as possible, that Jihad is the only solution and that "I just can't stop; there is no other choice for me".

At an August 2, 2011 meeting, the UCs gave Ferdaus money to pay the remaining balance on the model plane. Ferdaus told them he would need twenty-five pounds of plastic explosives and asked them to get it for him. On August 29, 2011, the remote controlled aircraft was delivered to the Framingham storage facility and Ferdaus thereafter moved it into the storage unit. On September 20, 2011, Ferdaus made a training video containing instructions on how to make cell phone detonators. He then gave an additional mobile phone detonation device to UC-2.

On September 28, 2011, the UCs brought the following to Ferdaus for inspection: explosives (purportedly twenty-five pounds of plastic explosive, but in reality four pounds), three grenades, and six fully automatic AK-47 assault rifles. After inspecting the items, Ferdaus brought them to and locked them in his storage unit. He was then arrested.

During the course of the investigation, Ferdaus made twelve cell phone "detonation" devices; those devices have been sent to the FBI's laboratory for evaluation. The FBI's bomb technicians made a similar device in accordance with instructions which Ferdaus gave on a homemade video tutorial (*Ex. 8*) and determined that the cell phones, as modified by Ferdaus, could be used as he intended, that is such cell phone devices could be used to provide an electrical impulse to an IED.

## Discussion of Whether Detention is Warranted

### A. Discussion of the Bail Reform Act

Under 18 U.S.C. § 3142 ("The Bail Reform Act" or "the Act"), the judicial officer shall order that, pending trial, the Defendant be (1) released on his own recognizance or upon execution of an unsecured bond; (2) released on a condition or combination of conditions; (3) temporarily detained to permit revocation of conditional release, deportation, or exclusion; or (4) detained. 18 U.S.C. § 3142(a). Under the Act, the judicial officer may detain a person pending trial only if, after a detention hearing held pursuant to 18 U.S.C. § 3142(f), the judicial officer determines that "no condition or combination of conditions [set forth under 18 U.S.C. § 3142 (b) or (c)] will reasonably assure the appearance of the person as required and the safety of any other person and the community". 18 U.S.C. § 3142(e). The Supreme Court, in *United States v. Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095 (1987) has cautioned that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Id.,* at 755, 107 S.Ct. at 2105. For this reason, the Defendant may be detained only if the judicial officer finds by (1) *clear and convincing evidence*, that the Defendant is a danger to the community, or (2) *a preponderance of the evidence*, that the Defendant poses a risk of flight. See 18 U.S.C. § 3142 (f); *United States v. Jackson*, 823 F.2d 4-5 (2$^d$ Cir. 1987); *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2$^d$ Cir. (1986), *cert. denied*, 479 U.S. 978, 107 S.Ct. 562, 93 (1986). *See also United States v. Patriarca*, 948 F.2d 789, 792-93 (1st Cir. 1991). Furthermore, the judicial officer "may not impose a financial condition that results in the pretrial detention of the person". 18 U.S.C. § 3142 (c).

The Bail Reform Act establishes a two step procedure for making the determination that the Defendant should be detained. First, the Government is entitled to move for detention on dangerousness grounds where the Defendant has been charged with one of the offenses enumerated in the statute for which Congress has determined that detention is warranted. *See* 18 U.S.C. § 3142 (f)(1). The Government may also move for detention, or the judicial officer may on his or her own motion move for detention, where the case involves a serious risk that the Defendant will flee or that the Defendant will obstruct or attempt to obstruct justice. 18 U.S.C. § 3142(f)(2). Second, the judicial officer must determine whether any condition or combination of conditions will adequately ensure the appearance of the Defendant and the safety of the community against any danger posed by the Defendant's pretrial release. *See United States v. Friedman*, 837 F.2d 48, 49 (2$^d$ Cir. 1988).

In making the determination as to whether "any condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of any other person and the community," the judicial officer is compelled to consider the following factors:

    (1)    the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

    (2)    the weight of the evidence against the person;

    (3)    the history and characteristics of the person, including:

        1.    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> 2. whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and
>
> (4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

The rebuttable presumption created by 18 U.S.C. § 3142(e)(3)(C) applies in this case because Ferdaus is charged with a federal act of terrorism as defined in 18 U.S.C. §2332b(g)(5)(B) for which a maximum penalty of ten years or more is prescribed. The Indictment establishes probable cause for the charges against Ferdaus. Therefore, I find that under 18 U.S.C. §3142(e)(3)(C), there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of Ferdaus or the safety of the community if he were released. If Ferdaus fails to produce or proffer any credible evidence on his own behalf to rebut this presumption, the presumption alone may justify detention. *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Vires*, 637 F. Supp. 1343, 1351 (W.D.Ky. 1986).

### B. Defendant's History and Characteristics

Ferdaus was not interviewed by Pretrial Services and the only information I have concerning his history and characteristics is that proffered by his counsel at the hearing.

Ferdaus is twenty-six years old. He is single and lives with his parents and brother in Ashland, Massachusetts. He has lived in Ashland his entire life. He graduated from Ashland High School in 2003 and from Northeastern University in 2008 with a degree in physics. His

father is a retired software engineer who is at home most of the time; his mother still works. He has extended family in the area.

As to Ferdaus's criminal history, a 2005 charge of possession of a Class D controlled substance was continued without a finding. Ferdaus has no other prior criminal convictions.

### C.  Nature of the Offense; Weight of the Evidence

#### 1.  Nature of the Offense

Ferdaus is charged with offenses which provide for a maximum penalty of twenty years (Counts One, Two and Three), fifteen years (Counts Five and Six) and ten years (Count Four). He faces a mandatory minimum sentence of five years on Count One.

#### 2.  Weight of the Evidence

The Government utilized a cooperating witness in this case and undercover FBI employees. While the CW's character and credibility is questionable, at best, the fact remains that Ferdaus had multiple recorded meetings and communications with the CW during which he advocated blowing up federal buildings and killing persons inside those buildings and persons fleeing such buildings. Additionally, Ferdaus met on multiple occasions with the UCs and during recorded meetings, details his attack plans. Ferdaus is also on tape soliciting the UCs assistance in obtaining financing and the necessary components to carry out his plan. Ferdaus provided the UCs with thumb drives containing his detailed plans and mobile phones which he had modified to turn into "detonators". Furthermore, Ferdaus told the UCs that the he thought that they were members of al Queda. Under the circumstances, the evidence against Ferdaus is strong.

3. Whether Detention is Warranted

Ferdaus's counsel has suggested that he has mental health issues and that he has a legitimate entrapment defense. Ferdaus's counsel also effectively undermined the credibility of the CW. However, none of the evidence proffered by Ferdaus addresses the issue of whether he is a danger to the community and therefore, I find that he has failed to rebut the presumption.[4] For that reason alone, detention is warranted. Nonetheless, for the sake of completeness, I will address whether independent of the rebuttable presumption, that Government has established that Ferdaus is a danger to the community.

The Government's stated ground for detention is 18 U.S.C. §§ 3142(f)(1)(A) (defendant is charged with crimes of violence and acts of terrorism). The Government has presented substantial evidence that Ferdaus: is angry at the United States because he is at odds with United States foreign policy; devised a detailed and well thought out plan to attack federal buildings, specifically the Pentagon and the Capital, utilizing remote controlled airplanes carrying explosives (his purpose for doing so was to strike out at the United States for purposes of disrupting the government's military center, *i.e.,* Washington D.C. in general, and the Pentagon in particular); planned to shoot individuals fleeing from the buildings post-attack using assault rifles; re-configured mobile telephone devices to be used as "detonators" and that he produced a video for purposes of teaching others to do the same; and aligned himself with the UCs, *whom he*

---

[4] While there is a statutory rebuttable presumption that Ferdaus is both a danger to the community and risk of flight, the Government moved for detention solely on dangerousness grounds pursuant to 18 U.S.C. §3142(f)(1)(A). Furthermore, while the Government noted in its closing argument that there is a rebuttable presumption that Ferdaus is risk of flight, the Government did not so argue and it did not contradict defense counsel's statement that the primary issue on detention is whether Ferdaus presents a danger to the community. Therefore, for purposes of this Order, the Court will assume that regardless of the rebuttable presumption, the Government did not intend to pursue detention on the grounds that Ferdaus is a risk of flight.

*believed to be members of al Queda*, in order to finance and carry out his attack plan. Additionally, Ferdaus mentioned the possibility of attacking subways and a military installation.

The evidence presented by the Government establishes that Ferdaus is intent on taking action against the United States and in the process, desires to kill Americans, whether military or civilian, whom he considers "kafirs," that is, "non-believers". The evidence also establishes that Ferdaus is an intelligent and troubled young man; he hold a degree in physics from Northeastern and has considerable knowledge of electronics. Additionally, he repeatedly told the UCs that he had the technical ability to accomplish his plans. Indeed, he reconfigured twelve cell phones for use as "detonation" devices and he prepared a video showing other how to make a mobile phone into a "detonator." Finally, on more than one occasion, he told the CW and UCs that he was thinking of preparing home made explosives to use in his plans. He even went so far as to purchase ammonia, which can be used in making a home made explosive.

Ferdaus's counsel argued that there is no evidence that his plan would have worked, indeed, that without modifications it likely would not have worked. She also argued that because the FBI provided the financing and components of Ferdaus's plan, including the rifles and explosives, his plan could not have been brought to fruition. She also points out that Ferdaus never was actually in contact with any terrorist organization. She described his plan as a "fantasy" fueled by his mental illness. However, counsel's arguments miss the mark. The reality is that the evidence is clear that Ferdaus *had carefully researched and wanted to carry out his plan* and that he *thought* he was in fact dealing with al Queda and *would if he could* make contact with members of al Queda or other like minded individuals. Simply put, what makes Ferdaus a significant danger to the community is not whether his plan would have worked or

17

whether he had the means to implement it, *but that it was his strong desire to see his plan carried out*.

Under these circumstances, I find that Ferdaus is a danger to the community. Furthermore, given Ferdaus's views and seeming dedication to his cause, I find there are no conditions or combination of conditions that the Court could impose that would assure the safety of the community, if he were released.[5]

## **Order of Detention**

In accordance with the foregoing memorandum, IT IS ORDERED:

1. That Rezwan Ferdaus be committed to the custody of the Attorney General, or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or se rving sentences or being held in custody pending appeal;

2. That Rezwan Ferdaus be afforded a reasonable opportunity for private consultation with counsel; and

3. On order of a court of the United States or on request by an attorney for the Government, the person in charge of the corrections facility in which Rezwan Ferdaus is detained and confined shall deliver him to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

---

[5] In making this determination, I have considered Ferdaus's suggestion that he be subjected to home detention with electronic monitoring. However, because the electronic bracelet can be removed, albeit with some difficulty, I do not find that home detention is a sufficient deterrent to a defendant who is truly intent on doing harm.

**RIGHT OF APPEAL**

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

                                          **/s/ Timothy S. Hillman**
                                          TIMOTHY S. HILLMAN
                                          MAGISTRATE JUDGE